Robb, P.J.
{¶1} Defendant-Appellant Leonard A. Savage Jr. appeals after being convicted in the Mahoning County Common Pleas Court of one count of aggravated murder and three counts of attempted murder. He contends counsel rendered ineffective assistance of counsel by creating the expectation during the opening statement that Appellant would testify and then not fulfilling the expectation. Appellant contests the removal of a prospective juror for cause who was perceived as biased in favor of the defense, and he challenges a curative instruction provided in response to a question the defense asked a witness. He raises issues with the manifest weight of the evidence and the application of the forfeiture by wrongdoing exception to the confrontation clause. For the following reasons, the trial court's judgment is affirmed.
STATEMENT OF THE CASE
{¶2} On November 25, 2015, Appellant was jointly indicted, with Jason N. Heard and Jawonn Hymes, for a November 14, 2015 shooting in Youngstown. Appellant was charged with aggravated murder in the death of Thomas Owens who was shot while in the backseat of a vehicle and three counts of attempted murder as to the three other occupants of the vehicle (and alternatively charged with three counts of *418 felonious assault). Appellant's case was severed from his co-defendants' cases and tried separately in November 2016.
{¶3} At the jury trial, a victim (Erik) testified he, his cousin Lottre, his brother Tony, and his friend Thomas Owens stopped at an establishment on Glenwood Avenue. Erik and Lottre placed a food order while Tony and Thomas smoked outside. Erik saw Jason Heard (whom he knew from when Heard was a student) with Appellant (whom he did not know). (Tr. 414-415). After Erik received the food, his group returned to the car planning to drive a short distance to his aunt's house where Tony had left his vehicle parked in front of the garage. Erik was driving his girlfriend's vehicle with Lottre in the front seat, Tony in the back on the passenger side, and Thomas Owens in the back on the driver's side. (Tr. 419). Erik proceeded north on Glenwood and then turned right onto Myrtle Avenue. His aunt's house was not far from that corner. Erik parked his car on the street in front of the driveway and behind a truck parked in front of his aunt's house. (Tr. 420). As they were saying goodbye to Tony, Erik noticed in his mirror a dark sedan turn the corner and pull to the side of him. (Tr. 421). He saw a gun and ducked. (Tr. 422).
{¶4} Multiple shots were fired at Erik's vehicle. It sounded to him as if two different guns were being fired. (Tr. 424). He felt shots hitting his door and window, and he believed he had been shot. (Tr. 425). His brother yelled for him to pull away. (Tr. 459). He initially had difficulty putting his car in reverse; he could not go forward as he was parked behind the truck. Upon getting the car in gear, he proceeded in reverse, while Lottre asked about injuries and Tony announced that Thomas was dead. (Tr. 423). Erik stopped his backwards progression, put the car in drive, and drove into his aunt's front yard, partially on the driveway and partially on the grass. He pulled Thomas from Tony's arms and saw his neck wound. (Tr. 425).
{¶5} The police were called, and they arrived at 12:23 a.m., within a minute of the dispatch. The 911 calls were played to the jury. The victim was shot twice on the left side of his body: high in the neck and near the hip. The bullets recovered from his body (a .45 caliber and a .40 caliber) were fired from different guns. (Tr. 721). The police found at the scene thirteen .40 caliber shell casings (all fired by the same gun) and two .45 caliber shell casings (fired by the same gun, which was a different gun than the one which fired the .40 caliber shells). (Tr. 725, 727).
{¶6} The police noticed seven bullet holes in the driver's door. It did not appear any of them penetrated through the door. (Tr. 503). The driver's window was shot out, and a bullet hit the driver's headrest. The driver's side passenger area had three bullet holes, and the window was shot out. (Tr. 504-505). The police found broken glass and blood in the street with a trail of blood showing part of the car's path into the yard. (Tr. 499). Further east on Myrtle, closer to the corner at Glenwood, the police noticed bullet fragments and broken glass and collected blood and a half-smoked cigar. (Tr. 491-492, 519). DNA consistent with Tony and Thomas was found on the cigar, and DNA extracted from the blood matched Thomas. (Tr. 519, 702-703, 878).
{¶7} A witness (Female A) testified she was a long-time acquaintance of Appellant and Jason Heard. She met them at a bar on South Avenue earlier in the night of the shooting. They arrived in a silver minivan. (Tr. 558). Later, she met them at the establishment on Glenwood Avenue. Appellant's brother, Jawonn Hymes, was with them. (Tr. 559). While they were outside, she saw Appellant, Jason Heard, and Jawonn *419 Hymes run across Glenwood at a southerly angle. (Tr. 562). Upon seeing the police arrive, she heard her friend (Female B, the daughter of Erik's long-time girlfriend) learn about the shooting over the phone and heard Female B say it was Jason and the people with him. (Tr. 563-564). After the shooting, Jason Heard called Female A and asked to meet at another bar. (Tr. 564). When the police asked her if Jason Heard went home with her that night, she told them he did not and she would not be his alibi for the shooting. (Tr. 567-568).
{¶8} The video statement of Female B was played to the jury after the court applied the forfeiture by wrongdoing exception to the confrontation clause and hearsay rules. (Tr. 603). She saw Erik, Thomas, Tony, and Lottre leave the establishment in her mother's vehicle. Her statement confirmed the video from the establishment and the testimony of her friend that Appellant, Jason Heard, and Jawonn Hymes ran across the street. Prior to this, she saw Jason Heard with a gun outside of the establishment. The video from the establishment confirmed that Jason Heard was holding a gun before the three defendants ran across the street.
{¶9} The court also applied the forfeiture by wrongdoing exception to admit video statements of a teenage minor who was in Appellant's van. (Tr. 600, 602). He said he met Jason Heard and Appellant at a bar on South Avenue and accompanied them in a gray van into the establishment on Glenwood Avenue. He waited in the van while Appellant and Jason Heard went in the establishment and saw Jawonn Hymes enter the establishment as well. Later, he saw the three standing outside and then running past the van to a black Nissan parked near the van. Soon after they drove away, this witness heard gunshots. Within minutes, the three co-defendants returned in the same black car. Appellant and Jason Heard entered the van, now wearing gloves.
{¶10} The day after the shooting, the silver van was involved in a police chase; the driver, who appeared to be Jawonn Hymes, fled from the van on foot. The owner of the van reported it should have been in the possession of Appellant, and Appellant's cell phone was found in the van. (Tr. 745-746).
{¶11} Videos from the establishment confirmed: a silver minivan pulled to the curb on Cleveland Street, which is across from the Glenwood establishment; after 15 minutes, another car parked behind the van; Appellant and Jason Heard exited the van and walked to the establishment with the occupant of the other car (Jawonn Hymes); the van lights stayed on for a long time (longer than a vehicle's automatic headlight shut-off would take) and were then extinguished (suggesting another person was still in the van and confirming the teenage witness's account); the red car holding the four victims parked in the parking lot, and the four approached the bar; Appellant ran across the street to the van and returned wearing gloves at 12:09 a.m. (camera time); the three co-defendants and the two females stood outside of the establishment; the four victims left the establishment and proceeded to the red car at 12:12; the red car left the parking lot heading north on Glenwood Avenue at 12:14; Jason Heard was holding a gun outside of the establishment; the red car turned right on Myrtle at 12:15; Appellant, Jason Heard, and Jawonn Hymes ran across Glenwood and east on Cleveland past the van; headlights turned on in a vehicle on Cleveland at 12:16 (in the area where Jawonn Hymes came from when he arrived at the bar); the car turned north on Glenwood and right/east on Myrtle; no other cars turned east on Myrtle (besides *420 the victim's vehicle and the pursuing vehicle) until 12:17:49, when the first police car can be seen approaching. Lastly, at 12:19, a car approached the back of the silver minivan on Cleveland, appeared to stop, and then, both the car and van drove away, turning south on Glenwood. Per police records, the first police car arrived at 12:23 a.m., and the detective testified the time on the establishment's video system was approximately 6 minutes behind actual time. (Tr. 812, 831, 924).
{¶12} Tony did not testify; he died sometime in the year between the shooting and the trial. (Tr. 426). Erik knew of no reason why anyone would shoot at him, Tony, or Lottre. A detective testified that Thomas pled no contest in 2005 to negligent homicide for accidentally shooting his friend (Richard Owens) in the head. (Tr. 676-678). Erik was present when relatives of Richard made a threat to Thomas. (Tr. 429).
{¶13} An inmate testified he was incarcerated with Appellant who told him: Appellant was in a bar when he saw Thomas Owens, the man who killed his uncle Richard in the early 2000's; with Jawonn Hymes driving, they followed him to where he was parked on Myrtle, at which point they "pulled up on them and got to shooting"; Appellant used a .40 caliber firearm which was his favorite because it penetrated vehicles; and Jason had a .45 caliber firearm. (Tr. 618-619, 623-624). The inmate also testified Appellant was nervous because a female witness cooperated with police, got jumped and threatened, stopped cooperating, and then started cooperating again; he said Appellant wanted her killed. (Tr. 619, 663-634). He said Appellant also declared he wanted a male witness dead due to his cooperation with the police. (Tr. 620, 664). After his mother visited, Appellant expressed a concern that Jason Heard would cooperate, in which case Appellant suggested he would confess and exculpate his brother Jawonn Hymes. (Tr. 621-622). Appellant also voiced a hope that the lab could not get DNA from a shell casing. (Tr. 619).
{¶14} The jury found Appellant guilty of aggravated murder via complicity and three counts of attempted murder (and felonious assault which merged for sentencing). In a January 17, 2017 judgment entry, the court sentenced Appellant to 25 years to life for aggravated murder and concurrent sentences of ten years for the attempted murders. This appeal followed.[1] Upon multiple extensions requested by both sides, briefing was complete in August 2018.
ASSIGNMENT OF ERROR ONE: INEFFECTIVE ASSISTANCE AT OPENING
{¶15} Appellant sets forth five general assignments of error. The issue presented under the first assignment of error queries:
"Is an unfulfilled promise that the accused will testify to tell their story constitutionally ineffective?"
{¶16} We review a claim of ineffective assistance of counsel under a two-part test, which requires the defendant to demonstrate: (1) trial counsel's performance fell below an objective standard of reasonable representation; and (2) prejudice arose from the deficient performance. State v. Bradley , 42 Ohio St.3d 136, 141-143, 538 N.E.2d 373 (1989), citing Strickland v. Washington , 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Both prongs must *421 be established; if the performance was not deficient, then there is no need to review for prejudice, and vice versa. State v. Madrigal , 87 Ohio St.3d 378, 389, 721 N.E.2d 52 (2000).
{¶17} In evaluating the alleged deficiency in performance, our review is highly deferential to trial counsel's decisions; there is a strong presumption counsel's conduct falls within the wide range of reasonable professional assistance. Bradley , 42 Ohio St.3d at 142-143, 538 N.E.2d 373, citing Strickland , 466 U.S. at 689, 104 S.Ct. 2052. We are to refrain from second-guessing the strategic decisions of trial counsel. State v. Carter , 72 Ohio St.3d 545, 558, 651 N.E.2d 965 (1995). Instances of debatable trial strategy very rarely constitute ineffective assistance of counsel. See State v. Thompson , 33 Ohio St.3d 1, 10, 514 N.E.2d 407 (1987). There are "countless ways to provide effective assistance in any given case." Bradley , 42 Ohio St.3d at 142, 538 N.E.2d 373, citing Strickland , 466 U.S. at 689, 104 S.Ct. 2052.
{¶18} To show prejudice, a defendant must prove his lawyer's errors were so serious that there is a reasonable probability the result of the proceedings would have been different. Carter , 72 Ohio St.3d at 558, 651 N.E.2d 965. Lesser tests of prejudice have been rejected: "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." Bradley , 42 Ohio St.3d 136 at fn. 1, 538 N.E.2d 373, quoting Strickland , 466 U.S. at 693, 104 S.Ct. 2052. Prejudice from defective representation justifies reversal only where the results were unreliable or the proceeding fundamentally unfair due to the performance of trial counsel. Carter , 72 Ohio St.3d at 558, 651 N.E.2d 965, citing Lockhart v. Fretwell , 506 U.S. 364, 369, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993).
{¶19} In opening statements, defense counsel stated: "My client maintains his innocence. He will get on the stand and tell you about his innocence." (Tr. 390). Six days later, after the state's case-in-chief was concluded, defense counsel advised: "I'm going to talk to my client about testifying, because it just came up within the last hour * * *." (Tr. 962). What "just came up" was not specified. After a recess, defense counsel informed the court his client would not be testifying. (Tr. 970). The court inquired of Appellant whether he understood he had the right not to testify and explained the court would instruct the jury accordingly. He was told the choice was his alone. He answered that he understood these advisements, and he chose not to testify and to avail himself of the constitutional right to remain silent. (Tr. 970-971).
{¶20} Appellant contends counsel rendered deficient performance by promising the jury Appellant would testify. He suggests counsel should not make promises that the defendant will testify (because the defendant may end up exercising his right against self-incrimination as he did here). He states he was prejudiced because the promise created a level of expectation (in line with a juror's natural desire for an explanation) and caused the expectation to go unfulfilled (by creating it in the first place).
{¶21} The state responds that counsel's performance should not be second-guessed by employing hindsight. The state urges the decision not to present a defendant's testimony is a tactical one and there is nothing in the record showing why the decision was made. If a claim of ineffective assistance of counsel requires proof from outside of the record, then such claim is not appropriately considered on direct appeal. State v. Hartman , 93 Ohio St.3d 274, 299, 754 N.E.2d 1150 (2001). See also *422 State v. Turner , 6th Dist. No. WD-11-025, 2012-Ohio-3863, 2012 WL 3637314, ¶ 45 (any advice by counsel to refrain from testifying was tactical, and the record did not disclose details behind the decision).
{¶22} Appellant replies his argument is not about whether it was a reasonable trial strategy to not present the defendant's testimony (which rationale is outside the record and where the record shows the decision was made by Appellant). Rather, his argument is the making of a promise in opening statement that may (and did) go unfulfilled.
{¶23} Appellant cites the Second District's West case where the court noted: "counsel should be wary of representing that a defendant will waive her Fifth Amendment right and testify, especially when whether she will is then an open question, as it apparently was here. If a defendant elects to not testify, the representation may then burden a defendant's exercise of her constitutional right." State v. West , 2d Dist. No. 22966, 2009-Ohio-6270, 2009 WL 4268554, ¶ 13. The West court nevertheless held the opening statement disclosing the defendant would testify (followed by the defendant's decision to not testify) was not conduct which undermined the reviewing court's confidence in the fairness of the proceedings. Id. at ¶ 14. It was emphasized how the jury was instructed that the defendant's decision to refrain from testifying could not be considered for any purpose. Id. (counsel also apologized in closing argument for telling the jury the defendant would testify).
{¶24} In another case, the Sixth District addressed an argument that counsel was ineffective for discussing, in opening statements, the defendant's anticipated testimony. The court held: "it is clear from the record that appellant ultimately chose not to testify in his defense. The trial court explained to the jury that appellant's decision could not be considered for any purpose. Appellant has not shown how trial counsel's opening statement prejudiced the defense." State v. Rickard , 6th Dist. No. WD-14-016, 2015-Ohio-3298, 2015 WL 4881023, ¶ 41.
{¶25} In a similar case, the Ninth District found no indication of deficient performance, observing: "The record is silent with respect to why Mr. Ball did not testify. It is possible that Mr. Ball informed his counsel mid-way through trial that he did not want to testify; a choice that Mr. Ball was entitled to make and that would not reflect on the quality of counsel's performance." State v. Ball , 9th Dist. No. 26537, 2013-Ohio-3506, 2013 WL 4107937, ¶ 37. The court also noted the reference to the defendant's anticipated testimony was not the crux of the opening statement. Id. Furthermore, the Ninth District relied on the jury instruction charging the jurors they could not consider the defendant's lack of testimony, which the jury was presumed to have followed. Id. at ¶¶ 35, 37.
{¶26} Here, as to deficient performance, the record shows some unknown matter arose, six days after the opening statement, which changed Appellant's mind about testifying. There is no indication a deficiency of counsel was the cause of this situation. Under Appellant's theory, it would always be deficient to state in opening statement that the defendant will be testifying (because he could always change his mind).
{¶27} In any event on the topic of prejudice, the trial court charged: "It is not necessary that the defendant take the witness stand in his own defense. He has a constitutional right not to testify. The fact that he did not testify must not be considered for any purpose." (Tr. 1105). We presume the jury followed this instruction. See, e.g., *423 State v. Leonard , 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 157. Additionally, as in Ball , the opening statement did not revolve around the reference to Appellant testifying. Moreover, the court instructed the jury that opening statements are not evidence. (Tr. 1102). Finally, contrary to Appellant's contention, the overall evidence was not lacking so as to elevate the status of this issue into one that lessens our confidence in the outcome of the proceedings. Based upon these considerations, this assignment of error is overruled.
ASSIGNMENT OF ERROR TWO: REMOVAL OF JUROR FOR CAUSE
{¶28} In his second assignment of error, Appellant contends the court violated his right to due process and a fair trial and asks:
"Did the trial court err when it removed a prospective juror for cause?"
{¶29} The prospective juror at issue was asked by the prosecutor: "can you assure me you will be fair and impartial, use your reason and common sense?" The prospective juror answered: "I would like to discuss that if we could just --" at which point he indicated he would like to speak outside the presence of the other jurors. (Tr. 148). Upon entering chambers, the court stated: "You were a little hesitant throughout, which is fine. What is the issue?" (Tr. 164-165). The prospective juror, who was white, spoke of his "biracial family" and voiced "I don't know morally if I feel comfortable enough to be subject to be objective to voice my opinion and be clear one way or the other." He answered in the affirmative when the court asked if he was saying he had "a leaning towards the fact that there may be prejudice in this world * * *." (Tr. 165). On further inquiry, he opined the system was fair but suggested some people are not due to racism. (Tr. 165-166). He indicated a belief the jury would find the defendant guilty based on the color of his skin, disclosing he had "a pretty strong opinion of it, and I just don't want to have an argument over deliberations * * *." (Tr. 166). The prospective juror indicated he wished to avoid the predicted scenario that would be him against the rest of the jurors during deliberations. (Tr. 166-167).
{¶30} The prosecutor then asked, "Am I right in understanding you are going to have a hard time being fair and impartial then because of your - - what you have coming into the trial?" He replied, "Yes. I have seen a lot of times where just the color of their skin makes a big difference." The prosecutor said he previously sensed an animosity toward police officers when the prospective juror was discussing a prior topic. The prosecutor thanked the prospective juror for being honest and admitting he could not be fair and impartial. (Tr. 167).
{¶31} Defense counsel then asked the prospective juror: "How could you not be fair and impartial if you are sensitive to race issues?" (Tr. 167-168). He answered by pointing out how many older whites would be on the jury who were raised with a certain mentality. Defense counsel inquired, "in terms of the facts, could you listen to the facts and make a decision based solely on the facts?" He responded, "Yes, I can. But that, again, would be the moral issue of it. I just - - the resistance that could be there just, you know, it might be 1 against 11, honestly." (Tr. 168).
{¶32} The court asked him to clarify if he meant the past treatment of African-Americans would lead him to "go in with the mindset that somebody is wrongfully accused right off the bat, and you are going to be there defending them against the white members of the jury * * *." (Tr. 168-169). The prospective juror agreed, answering:
*424 "Essentially in a nutshell." He then stated, "I would rather see him -- " at which point the court asked if there was anything that would "change your view of how this could be." He replied: "I am not sure, honestly."
{¶33} He then responded in the affirmative when defense counsel stated, "But you did say that you can assess the facts?" (Tr. 169). Defense counsel continued to ask: "If you believe the prosecutor's story, would you find my guy not guilty if you believed what the prosecutor had to offer?" (Tr. 169-170). The prospective juror declared: "Yeah, if it was there, yeah" and "Based on the facts, yeah." The court then reiterated: "His question was would he find the defendant, Mr. Savage, not guilty even if the prosecutor proved his case?" The prospective juror responded, "I am not sure, honestly." (Tr. 170).
{¶34} Outside the prospective juror's presence, the court concluded the last answer made it obvious to the court the juror should be removed for cause. (Tr. 170). The court construed the answer to be that the juror did not think he could find the defendant guilty if the state proved its case. (Tr. 171). Defense counsel suggested this did not qualify as a challenge for cause. The state responded: "if the shoe was on the other foot and if it was a police officer sitting in here saying I can't be fair and impartial, he would be gone. That was [a police officer removed for cause earlier in voir dire]." (Tr. 172). This police officer had been removed for cause after stating that if it "came down to something right on the wire, it would be very hard for me not to express some type of bias [towards the state]." (Tr. 75).
{¶35} The court concluded the prospective juror at issue exhibited the inability to act as an independent juror, hear the facts, and make an impartial decision as he expressed he did not think he could find the defendant guilty even if the state proved its case. (Tr. 172). Defense counsel asked to question the prospective juror further, the court refused, and defense counsel noted his objection. (Tr. 172-173).
{¶36} A prospective juror can be challenged for various causes including where "the juror is possessed of a state of mind evincing enmity or bias toward the defendant or the state." Crim.R. 24(C)(9) ; R.C. 2945.25(B). The person shall not be disqualified due to a previous opinion as to the defendant's guilt or innocence unless the court is not "satisfied, from the examination of the juror or from other evidence, that the juror will render an impartial verdict according to the law and the evidence submitted to the jury at the trial." Id. A catch-all provision in the rule provides a juror can be challenged and removed for cause if "the juror is otherwise unsuitable for any other cause to serve as a juror." Crim.R. 24(C)(14) ; R.C. 2945.25(O).
{¶37} During voir dire, a trial court has broad discretion in determining a juror's ability to be fair and impartial, and the court's decision on a challenge for cause will not be reversed unless the court clearly abused its discretion. State v. Trimble , 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242, ¶ 73 ; State v. Gross , 97 Ohio St.3d 121, 2002-Ohio-5524, 776 N.E.2d 1061, ¶ 33. An abuse of discretion involves an attitude that is unreasonable, arbitrary, or unconscionable. State v. Clinton , 153 Ohio St.3d 422, 2017-Ohio-9423, 108 N.E.3d 1, ¶ 46. A decision is considered unreasonable if there is no sound reasoning process to support it. Id. The reviewing court defers to the trial court's decision where a prospective juror was challenged for bias as the trial judge has the opportunity to personally view and hear the prospective juror during voir dire.
*425 Trimble , 122 Ohio St.3d 297 at ¶ 73, 911 N.E.2d 242.
{¶38} Appellant complains the court improperly equated the prospective juror's statement that he "was not sure" if he would find the defendant not guilty even if the prosecution proved its case with a statement that the juror "did not think" he could find the defendant guilty even if the prosecutor proved its case. He believes this evinces an unsound reasoning process, positing that "I don't think so" would have been a more irreversible position than "I am not sure, honestly." Appellant also argues the court should have permitted further questioning of the prospective juror. He believes any error on this subject could not be considered harmless as it involved the alteration of the fundamental make-up of the jury.
{¶39} Whether one uses terminology akin to "I do not think so" or "I am not sure," this juror could not assure the court he could find the defendant guilty even if the state proved its case and even if he believed the state's evidence. A court is not restrained to only remove for cause unequivocal jurors. The prospective juror brought to the court's attention concerns of his own bias toward the defendant and against the state, and he suggested the other jurors would be biased toward the state due to the defendant's race. The juror anticipated an argument with the other jurors that he did not wish to enter and predicted the verdict would be 11 to 1 with him as the holdout. The court could reasonably find enough questions were asked and thus was not required to permit defense counsel to ask more questions of the prospective juror. Even if a prospective juror changes to a less biased answer on further questioning, it is for the court to determine if the prospective juror is possessed of a state of mind biased toward the state or the defendant. The court examined the juror outside the presence of the jury pool and allowed the prosecutor and defense counsel to examine him, after which the trial court was not satisfied the juror could render an impartial verdict according to the law and the evidence submitted at the trial. It was not unreasonable to excuse the juror for cause under Civ.R. 24(C)(9) or (14). In accordance, this assignment of error is overruled.
ASSIGNMENT OF ERROR THREE: CURATIVE INSTRUCTION
{¶40} Appellant's third assignment of error claims judicial bias violated his rights to due process and a fair trial. More specifically, he asks:
"Is it unconstitutional judicial bias for a court to align itself with the prosecution and a prosecution witness through an overstated curative instruction?"
{¶41} Appellant's fellow jail inmate testified to various incriminating facts he said Appellant told him. On re-cross examination, defense counsel asked the witness: "Did [the assistant prosecutor] feed you any of that information while you were in jail?" The witness answered in the negative, the prosecutor objected to the question, and the court sustained the objection declaring, "Disregard that statement as though it never occurred." (Tr. 665). The prosecution described the question as beyond the scope of allowable re-cross and as a baseless attack on the prosecutor. (Tr. 668-670). The prosecution asked the court for a curative instruction stating there was no evidence the witness was fed any information. The court agreed and ordered the prosecutor to prepare an instruction for the court's review. (Tr. 670). The court thereafter instructed the jury:
During the cross examination of [the witness], defense counsel asked if the prosecutor, quote/unquote, fed him information. The prosecutor objected, and *426 the objection was sustained by me. I find it necessary to give you a curative instruction as follows: There is absolutely no evidence whatsoever that the prosecutor or any other law enforcement official fed [the witness] information or otherwise committed any -- communicated any information to him. The only evidence in this case from that witness, [the witness] obtained came directly from the defendant, Leonard Savage, okay?
(Tr. 671). Defense counsel subsequently noted his objection for the record.
{¶42} On appeal, Appellant contends that even if the first part of the instruction (about feeding the witness information) was necessary, the court should not have mentioned the source of the information in the witness's testimony. Appellant claims this part of the instruction (suggesting the only evidence or source of information came from this witness) was incorrect as a detective testified the information the witness provided could have come from a source other than the defendant. (Tr. 901). (We note the detective also testified at pages 826-827 that the witness provided some information that was not contained in police reports or detective notes, such as the position of the suspects within the vehicle.) Notably, the cited testimony by the detective was presented after the curative instruction was provided. The curative instruction would only speak to what information was presented at that point in time.
{¶43} Appellant's main argument is that the curative instruction went too far by essentially declaring the witness's information came from the defendant. He believes this part of the curative instruction exhibited judicial bias by essentially bolstering the witness's credibility and adopting the state's case. Judicial bias is described as "a hostile feeling or spirit of ill will or undue friendship or favoritism toward one of the litigants or his attorney, with the formation of a fixed anticipatory judgment on the part of the judge, as contradistinguished from an open state of mind which will be governed by the law and the facts." State v. LaMar , 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 34. "[A] criminal trial before a biased judge is fundamentally unfair and denies a defendant due process of law." Id.
{¶44} As Appellant suggests, the jury is presumed to follow the court's curative instruction. See State v. Treesh, 90 Ohio St.3d 460, 480, 739 N.E.2d 749 (2001). However, it appears the trial court was saying the only evidence presented by that witness was obtained from the defendant. The final sentence in the curative instruction may be choppy, but it need not be read as meaning the court believed the witness that his information came from Appellant telling it to him. There is no indication of judicial bias, and Appellant misconstrues the trial court's curative instruction.
{¶45} In fact, the court subsequently instructed the jurors they were "the sole judges of the facts, the credibility of the witnesses and the weight of the evidence." (Tr. 1103). The court explained they should apply the tests of truthfulness applied in everyday life, including the manner of testifying, the witness's appearance on the stand, the accuracy of the witness's memory, the witness's intelligence, interest, and bias, the reasonableness of the testimony, and the opportunity of the witness to see, hear, and know the information being provided. (Tr. 1103-1104). Finally, the court advised: "you will assign to the testimony of each witness what weight as you deem proper. You are not required to believe the testimony of any witness, and it is your province to determine what testimony is worthy of belief and what testimony is not *427 worthy of belief." (Tr. 1104). The jury is also presumed to have followed these instructions which were not at odds with the disputed curative instruction. In accordance, this assignment of error is without merit.
ASSIGNMENT OF ERROR FOUR: MANIFEST WEIGHT
{¶46} Appellant's fourth assignment of error provides:
"Leonard Savage's convictions are against the manifest weight of the evidence."
{¶47} Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other." State v. Thompkins , 78 Ohio St.3d at 387, 678 N.E.2d 541. It depends on the effect of the evidence in inducing belief but is not a question of mathematics. Id. A weight of the evidence review considers the state's burden of persuasion. See id. at 390, 678 N.E.2d 541 (Cook, J., concurring). When a defendant claims the conviction is contrary to the manifest weight of the evidence, the appellate court is to review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. State v. Lang , 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 220, citing Thompkins , 78 Ohio St.3d at 387, 678 N.E.2d 541.
{¶48} This discretionary power of the appellate court is to be exercised only in the exceptional case in which the evidence weighs heavily against the conviction. Id. "[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." State v. Hunter , 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 118, quoting State v. DeHass , 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. The trier of fact occupies the best position from which to weigh the evidence and judge the witnesses' credibility by observing their gestures, voice inflections, and demeanor. Seasons Coal Co. v. Cleveland , 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). We therefore generally proceed under the premise that when there are two fairly reasonable views of the evidence or two conflicting versions of events, neither of which is unbelievable, we do not choose which one we believe is more credible. State v. Gore , 131 Ohio App.3d 197, 201, 722 N.E.2d 125 (7th Dist.1999). In addition, circumstantial evidence inherently possesses the same probative value as direct evidence. State v. Treesh , 90 Ohio St.3d 460, 485, 739 N.E.2d 749 (2001).
{¶49} In reviewing the weight of the evidence, we refer to the facts set forth in our Statement of the Case supra. Appellant characterizes much of the evidence presented against him as lacking in credibility or as speculative. He notes the inmate witness could have obtained information from rumors and other sources and was lying when he testified Appellant admitted to the shooting and its surrounding circumstances to him. Appellant points to the circumstantial character of some of the evidence and says the video from the establishment only establishes his proximity to the victims at the pertinent time. He points out Erik (the victim of the shooting who was in the driver's seat) testified that he did not have a chance to view any of the individuals in the vehicle from which the gunshots were fired. Appellant emphasizes the area of glass and blood closer to the corner of Myrtle and Glenwood and suggests it shows there was a discrepancy in *428 Erik's story. He also points to the gunshot residue on the hands of Erik and the other two survivors in his car.
{¶50} Although gunshot residue tests of the hands of the three survivors came back positive, there was testimony this could be from: the discharge from fairly close range of projectiles into the enclosed vehicle, including through the windows; their close proximity to the victim when he was shot; their touching of the victim after the death; and other factors. (Tr. 684-685, 687). The jury heard and saw Erik testify. The victim was his friend. He saw a vehicle turn onto Myrtle and pull beside his parked vehicle. When he looked at the vehicle, he saw a gun, he ducked, and gunfire erupted. His vehicle was shot multiple times from the side of the car facing the street. (The forensic pathologist confirmed the victim was shot at an angle from left to right, meaning from the side of the vehicle facing the street.) Erik said the occupants of the vehicle did not shoot back at the assailants. The jury could find his testimony credible.
{¶51} Erik also explained how he ducked during the shooting while trying to put his car in reverse and back away (as there was a truck parked in front of his vehicle). He did not believe he traveled as far as the corner while in reverse, estimating he reversed only enough to get around the parked truck and enter his aunt's yard. Still, the location of glass and blood closer to the corner was not actually as far as the corner. And, Erik may have understandably underestimated how far he traveled in reverse, as he ducked while driving and was subjected to a barrage of gunfire and then learned his friend was dead just prior to driving forward into the yard. In addition, one can use their own experience to conclude what could happen to loose objects (such as broken window glass) on a car attempting to escape in reverse with a driver ducking while the car stops before an intersection. Notably, the witness's aunt's house was not far from the corner. In addition, there was testimony an ambulance pulled into the crime scene to attend to the victim and was instructed to leave the crime scene. The fact that evidence was found not only in front of the aunt's house but also further down toward the corner was not some exculpatory revelation destroying the witness's testimony or the state's theory of the case.
{¶52} Next, the video from the establishment showed more than merely Appellant's proximity and availability. It showed he arrived at the establishment with Jason Heard in a van owned by a person who said it was in Appellant's possession at the time. Appellant's brother arrived separately, parking by the van. The video demonstrates they were at the establishment when the victims arrived. Appellant went to the van and returned wearing gloves. He watched the victims' vehicle travel down the street. The person he arrived with was openly holding a gun. Appellant, his brother, and the person holding the gun then ran across the street toward the vehicle parked by Appellant's van; a vehicle driven to the establishment by Appellant's brother. This vehicle traveled from Glenwood to Myrtle after the victim's vehicle. No other vehicles turned down Myrtle from Glenwood after the victim's vehicle turned and before the first police car arrived in response to the 911 call. Erik, the driver of the bullet-ridden vehicle, testified the vehicle from which the shots were fired turned onto Myrtle from Glenwood.
{¶53} Erik heard two different guns being fired. Confirming this, thirteen .40 caliber shell casings and two .45 caliber shell casings were collected from the scene. The shells of the same caliber bullet were fired from the same gun; the shells of different caliber bullets were fired from *429 different guns. The bullets recovered from the murder victim's body (a .45 caliber and a .40 caliber) were fired from different guns.
{¶54} Furthermore, as set forth in the Statement of the Case above, a witness testified he was incarcerated with Appellant who disclosed various incriminating items about his role in the shooting, the types of weapons, his motive, and various issues with cooperating witnesses. The jury was informed of this witness's legal situation. The jury was in the best position to judge this witness's credibility by observing his demeanor, gestures, voice inflection, and eye movements as he testified.
{¶55} This is not an exceptional case where the evidence weighs heavily against the conviction requiring a new trial. A manifest miscarriage of justice is not apparent, and there is no indication the jury lost its way in weighing evidence and evaluating credibility. Consequently, this assignment of error is overruled.
ASSIGNMENT OF ERROR FIVE: FORFEITURE BY WRONGDOING
{¶56} Appellant's fifth and final assignment of error contends his confrontation rights were violated, framing the issue as follows:
"Does the wrongdoing of individuals associated with the accused establish wrongdoing by the accused by a preponderance of the evidence?"
{¶57} Two days after the shooting, the police interviewed the teenaged minor who waited in Appellant's van (parked across from the establishment with the security cameras). Besides his November 16, 2015 video statement, the teenager provided another video statement on October 4, 2016 in preparation for trial. Female B, who was at the establishment before and during the shooting, gave a video statement to police on September 9, 2016. When the teenager expressed he would not testify and went into hiding, the court held an evidentiary hearing on November 11, 2016 to determine whether the forfeiture by wrongdoing exception to the confrontation clause should be applied to permit the state to use his video statements at trial. At this time, the teenage witness was no longer a minor. After hearing arguments and testimony by various witnesses on the issue, including testimony from Female B, the court applied the forfeiture by wrongdoing exception to the teenager's video statements. Then, during trial on November 16, 2016, the state informed the court that Female B was now refusing to testify at trial. After a mid-trial hearing on the matter, the court found the forfeiture by wrongdoing exception applied to this witness as well. The video statements of the teenager and Female B were played for the jury on November 17, 2016.
{¶58} There is no dispute these video statements to the police were testimonial. If a hearsay statement being considered for admission was testimonial, it is subject to the confrontation clause. Crawford v. Washington , 541 U.S. 36, 61-62, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). However, "[t]he Constitution does not guarantee an accused person against the legitimate consequences of his own wrongful acts." Reynolds v. United States , 98 U.S. 145, 159, 25 L.Ed. 244 (1879). "The rule of forfeiture by wrongdoing (which we accept) extinguishes confrontation claims on essentially equitable grounds." Crawford , 541 U.S. 36, at 62, 124 S.Ct. 1354.
{¶59} Therefore, even when confrontation rights apply, testimonial hearsay can be admitted under the common law forfeiture by wrongdoing exception (also called wrongful procurement of *430 unavailability doctrine). State v. Fry , 125 Ohio St.3d 163, 2010-Ohio-1017, 926 N.E.2d 1239, ¶ 108, citing Giles v. California , 554 U.S. 353, 128 S.Ct. 2678, 171 L.Ed.2d 488 (2008). The doctrine applies when the defendant engaged in conduct designed (with intent) to prevent the witness from testifying. Id. (explaining intent is required). Defendants forfeit the right to confrontation if they "seek to undermine the judicial process by procuring or coercing silence from witnesses * * *." Davis v. Washington , 547 U.S. 813, 833, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006).
{¶60} An evidentiary rule was promulgated to encompass this forfeiture principle. See State v. McKelton , 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, ¶ 96. Pursuant to Evid.R. 804(B)(6), the forfeiture by wrongdoing hearsay exception permits the admission of: "A statement offered against a party if the unavailability of the witness is due to the wrongdoing of the party for the purpose of preventing the witness from attending or testifying." The type of wrongdoing covered goes beyond murder or physical assault of the witness; in fact, "the wrongdoing need not consist of a criminal act." 2001 Staff Note to Evid.R. 804(B)(6) ("Encouraging a witness to leave the state is wrongdoing in this context because no person has the legal right to refuse to provide testimony in the absence of a privilege or other rule of evidence."). See also Giles , 554 U.S. at 374, 128 S.Ct. 2678 (the common law forfeiture rule had a purpose of "removing the otherwise powerful incentive for defendants to intimidate, bribe, and kill the witnesses against them" and coincided with the court's power to protect the integrity of its proceedings).
{¶61} In using the forfeiture by wrongdoing exception, the state must show by a preponderance of the evidence: (1) the defendant's wrongdoing resulted in the witness's unavailability and (2) one purpose was to cause the witness to be unavailable at trial. State v. Hand , 107 Ohio St.3d 378, 2006-Ohio-18, 840 N.E.2d 151, ¶¶ 84, 87, 90. The state need only show the defendant's wrongdoing which caused the witness's unavailability "was motivated in part by a desire to silence the witness." Id. at ¶¶ 84, 90 (a defendant can have various purposes, and the state need not show the defendant's sole motivation was to eliminate the victim as a potential witness). In making the admissibility decision, a court is not bound by the rules of evidence. Evid.R. 104(A) (except rules on privilege). Although evidentiary decisions on hearsay are typically reviewed for an abuse of discretion, courts are instructed to "review de novo evidentiary rulings that implicate the Confrontation Clause." McKelton , 148 Ohio St.3d 261, 70 N.E.3d 508, at ¶ 97.
{¶62} At the November 11, 2016 admissibility hearing on the application of this exception to the teenager's video statements, the prosecutor advised the court there had been threats to four of the state's witnesses. The prosecutor said the teenager cooperated two days after the shooting and again a month before trial but was now in hiding. The prosecutor asked the court to take judicial notice that the lack of cooperation by this witness began after defense counsel asked if he could bring the transcribed statements to his client, which were previously sealed and marked counsel-only. (Tr. 270-272).
{¶63} The efforts to locate the witness and convince him to return were testified to by his mother, his victim-witness representative, and two U.S. Marshals. Testimony was also presented about why he was fearful and in hiding. He told his mother he would not be coming to trial because there was "money on his head in Youngstown" due to this case. (Hrg.Tr. 130-131).
*431 She feared retribution for his cooperation. She previously heard there was "a price over his head" from family in Youngstown. (Hrg.Tr. 147). The victim-witness representative heard about the witness's fear and the threat of money being placed on his life when she spoke to the teenager's aunt. (Hrg.Tr. 166-167). The marshals confirmed the relatives explained the witness was hiding from the people he was supposed to testify against and was in fear. (Hrg.Tr. 193-194, 206, 213).
{¶64} Female B testified at the hearing that after she spoke to police, she received threats on social media, her car was firebombed in her driveway, and a hammer was thrown through a window when she was present. (Hrg.Tr. 102-103, 109). She said the trial was predicted to start days earlier at which time a friend called her saying someone wanted to meet with him to see if she was going to testify because Appellant's uncle (named Kevin) was "going to snatch me up" so she would not be at trial to testify and he was also going to "snatch up" Female A and the teenager as well. (Hrg.Tr. 104-106). The prosecutor played a recording of Female B's phone report of this incident to the prosecutor on November 7, 2016. (Hrg.Tr. 105).
{¶65} A detective testified to confirm the firebombing of Female B's car. As to Female A, he said her step-father originally said she would not be cooperating as it put her in danger. The detective disclosed the jail inmate's report that Appellant said, "Just gotta kill that bitch" regarding the teenager because he told the detectives who was in the van. The inmate also reported Appellant declared something akin to: "Need girl who wrote statement dead. She got jumped and said she wasn't coming." (Hrg.Tr. 254). The detective said Female B previously reported to him that she had been "jumped" due to her being a "snitch." (Hrg.Tr. 266-267). Later, at trial, the inmate's testimony reiterated Appellant's statements to him regarding these two witnesses. (Tr. 619-620).
{¶66} After testifying at the November 11 hearing regarding the teenager's absence, Female B decided she would not testify at trial on November 16 despite the subpoena. She told the prosecutor by texts (which were printed for the court) that the threats against her were continuing, she felt as though she needed to move herself and her young children out of town, she could not drive her car as Appellant's uncle was looking for her, and there was money on her head. (Tr. 578-581). The prosecutor informed the court that during the admissibility hearing, a spectator took a photograph of Female B on the witness stand with his phone in violation of a court order. This spectator was charged with contempt of court as a result. He was the person whom Appellant's brother/codefendant claimed was his alibi. He posted the photograph of Female B on social media with captions saying: "Detective ass bitches man yall hoes crazy free Lenny, Wann and Jason" and "SMH [shaking my head] Look at this bitch [her nickname]." Comments were added by others, including one saying, "Hoe yu die." (Tr. 577). The court considered this new evidence along with the testimony at the motion hearing to find the forfeiture by wrongdoing exception applied to this witness as well.
{¶67} Appellant argues: even if the two unavailable witnesses believed their lives were in danger due to their anticipated testimony against Appellant and even assuming wrongdoing such as intimidation occurred, there was no evidence Appellant personally contacted the witnesses or encouraged the wrongdoing. He notes he was in jail since his arrest. He argues the statements the inmate claimed he made in jail did not demonstrate a plan or a means to convey the threats.
*432 {¶68} The forfeiture by wrongdoing rule involves the defendant intentionally procuring the witness's unavailability, but procuring does not require the defendant himself to be the one who personally contacted the witness. See generally Davis , 547 U.S. at 833, 126 S.Ct. 2266 ("seek to undermine the judicial process by procuring or coercing silence from witnesses"). As Giles observed in explaining why intent was required, the common law interpretations of the rule included situations where: a defendant "schemed" to bring about the absence from trial through his "contrivance"; a defendant designed to bring about the result procured, which could include "when he uses an intermediary for the purpose of making a witness absent"; and a witness "had been kept out of the way by the prisoner, or by some one on the prisoner's behalf, in order to prevent him from giving evidence against him." Giles , 554 U.S. at 361, 128 S.Ct. 2678.
{¶69} Therefore, a defendant's intentional procuring of the witness's unavailability for trial may be performed by others acting on his behalf. Rice v. Marshall , 709 F.2d 1100, 1104 (6th Cir.1983) (finding it reasonable for the trial court to conclude the witness was intimidated into silence by the defendant, who was an enforcer for his gang, or by his "functionaries"), adopting State v. Rice , Ohio App. Ct. No. CA-2624 (Nov. 16, 1979) (where state court held the trial court reasonably concluded the witness had been intimidated into silence by appellant "or his functionaries"). See also United States v. Mastrangelo , 693 F.2d 269, 273-74 (2d Cir.1982) (finding a defendant's involvement in the witness's unavailability through "knowledge, complicity, planning or in any other way" waives confrontation clause objections).
{¶70} As to whether there was adequate evidence showing Appellant was involved in witness intimidation or in otherwise procuring unavailability of the witnesses, the standard is a mere preponderance of the evidence. Hand , 107 Ohio St.3d 378, 2006-Ohio-18, 840 N.E.2d 151, at ¶ 87. A preponderance of the evidence is defined as the measure of proof that convinces the judge that "the existence of the fact sought to be proved is more likely than its nonexistence." State ex rel. Doner v. Zody , 130 Ohio St.3d 446, 2011-Ohio-6117, 958 N.E.2d 1235, ¶ 54 (as opposed to the higher standard of clear and convincing evidence which must produce a "firm belief or conviction" in the mind of the factfinder). Circumstantial evidence inherently possesses the same probative value as direct evidence. State v. Treesh , 90 Ohio St.3d 460, 485, 739 N.E.2d 749 (2001). Rational inferences are permissible and are evaluated in the state's favor in ascertaining the sufficiency of evidence. See, e.g., State v. Filiaggi , 86 Ohio St.3d 230, 247, 714 N.E.2d 867 (1999).
{¶71} In reviewing the evidence presented by the state at the admissibility hearing and at trial, the rational inferences available, and the surrounding facts and circumstances, this court concludes the preponderance of evidence supports a finding that Appellant participated in procuring the witness's absence. The trial court had evidence that Appellant expressed that he needed to kill the teenager who had been in his van due to his cooperation with the police. And, the court had evidence that Appellant expressed he needed the female dead, noting she had already been "jumped" once (which prompted her to not cooperate in the past). A detective confirmed she previously reported being jumped. Then, the two witnesses at issue stopped cooperating as they were told there was a bounty on their lives. This was around the time Appellant was permitted to view statements previously sealed as *433 counsel-only. Additionally, soon after Female B spoke to detectives, her car was firebombed and a hammer was thrown through a window at a location where she was present. Later, she learned Appellant's uncle was looking for her, her friend, and the teenager to "snatch up" if they would be testifying at trial. Finally, while she was testifying at a hearing, an associate of Appellant's brother/codefendant violated a court order to take her photograph and post scornful comments which prompted others to threaten her.
{¶72} A court could rationally find it was "more likely than not" that Appellant was involved in intentionally procuring the witnesses' unavailability for trial. See Zody , 130 Ohio St.3d 446, 2011-Ohio-6117, 958 N.E.2d 1235, at ¶ 54. In applying the preponderance of the evidence standard, the court need not develop a "firm belief or conviction" (such as required when applying the clear and convincing standard). See id. ; Hand , 107 Ohio St.3d 378, 2006-Ohio-18, 840 N.E.2d 151, at ¶ 87. As there was substantial, credible evidence of threats against the witnesses, the trial court properly permitted the video statements of the two witnesses to be played at trial under the forfeiture by wrongdoing exception. Because there was no error in applying the forfeiture by wrongdoing exception under the circumstances of this case, this assignment of error is overruled.
{¶73} The trial court's judgment is hereby affirmed.
Donofrio, J., concurs.
Bartlett, J., concurs.

Appellant filed a premature notice of appeal, resulting in a 2016 case number. He thereafter filed a timely appeal from the sentencing entry, resulting in a 2017 case number. The 2017 case was dismissed as a duplicate, leaving the 2016 case number.