[Cite as *State v. Benson*, 2019-Ohio-3255.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

|  |  |  |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-180128 |
|  |  | TRIAL NO. B-1701853 |
| Plaintiff-Appellee, | : |  |
|  |  |  |
| vs. | : | *O P I N I O N.* |
|  |  |  |
| BRIANA BENSON, | : |  |
|  |  |  |
| Defendant-Appellant. | : |  |

Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is:  Affirmed as Modified

Date of Judgment Entry on Appeal:  August 14, 2019

*Joseph T. Deters,* Hamilton County Prosecuting Attorney, and *Alex Scott Havlin,* Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Bryan R. Perkins,* for Defendant-Appellant.

**BERGERON, Judge.**

{¶1} A senseless tragedy ended Madelyn Hart's life. A jury found Briana Benson culpable for that tragedy, and the trial court handed down a prison sentence that irreparably changed the trajectory of her own life. She asks us to review her trial—challenging numerous aspects of the proceedings. Although the trial court committed error as it relates to the admissibility of expert testimony, having pored over the record, we cannot conclude that this error warrants a new trial. For the reasons explained below, we affirm the conviction and vacate and modify one aspect of the sentence.

I.

{¶2} Myah Wright, defendant-appellant Briana Benson's younger sister, and Anna Castano, a friend of the victim, Madelyn Hart, had a falling out in the early part of 2017. Tensions escalated between Ms. Wright and Ms. Castano over the course of several weeks, confirmed by testimony, text messages, and social-media feuding. Then, in the very early morning hours of March 26, 2017, Ms. Benson, who at the time was at her friend Jasmine Slone's Northside home, received a phone call from her sister's phone, indicating that her sister was in danger. Duly concerned, Ms. Benson and Ms. Slone hopped in the former's car and drove downtown to find and collect the sister. They eventually found Ms. Wright at her car with two friends on Plum Street. Ms. Benson, noticing that the group appeared to be intoxicated, left her own car and took over the driver's seat of her sister's car. Ms. Slone, Ms. Benson's sister, and the two friends piled into the car. After Ms. Benson began driving, the car approached a small group of pedestrians that included Ms. Castano at the corner of Seventh and Walnut Streets. The car made a right-hand turn onto Walnut Street and stopped in the curbside lane next to this group.

{¶3} Immediately upon seeing Ms. Wright's car at the corner of Seventh and Walnut Streets, Ms. Castano rushed over to it, opened the back door where Ms. Wright was sitting and began a protracted fight between the group in Ms. Wright's car and the group with Ms. Castano (including the victim), drawing multiple participants into the orbit of the Wright-Castano feud. Several surveillance cameras in the area of the fight captured the melee, in video that was both graphic and disturbing. Importantly, during this altercation, Ms. Benson and Ms. Hart directly fought each other—at one point, Ms. Benson dragged Ms. Hart by her hair, and proceeded to kick her and stomp on her face.

{¶4} The fight eventually dispersed. As it broke up, Ms. Slone collected some items scattered in the street, which included the victim's car keys, and placed them in the car before they left the scene. Ms. Benson and her four passengers returned to her sister's car, and she drove the group back to Plum Street.

{¶5} Ms. Benson sent her sister home with her friends and returned to the driver's seat of her own car with Ms. Slone. She began driving around downtown and wound up just around the corner from where the fight had occurred. She passed Ms. Castano's group on Seventh Street and turned, for a second time, onto Walnut Street. She slowed the car down after she turned, and Ms. Hart came running from Seventh Street toward the car and intercepted it on Walnut Street. Ms. Hart proceeded to strike the car with her hands—as posited by the state, in an effort to retrieve her own car keys (which she believed to be in the vehicle).

{¶6} When Ms. Hart first reached the car, she struck it twice with her hands along the back passenger side of the vehicle. She then retreated toward the sidewalk—over a car's length from Ms. Benson's car, which was in the center lane. Rather than drive away at this point, Ms. Benson stayed put, and then the altercation

3

rekindled. Ms. Hart approached the car again, moving toward the front (but still passenger side) of the vehicle. During this second approach by Ms. Hart, Ms. Benson reversed her car at an angle. As a result, her wheels were, to a certain extent, cocked to the passenger's side. The victim's foot was either in front of the passenger side front wheel or very near to it. At this point, the car jolted to the right, striking Ms. Hart. Ms. Benson's car continued to the right and ran over her; then turned slightly to the left, straightened, and dragged her approximately halfway down the block. At that point, Ms. Hart's body disengaged from underneath the car. This entire encounter was chronicled by video evidence from various cameras in the vicinity.

{¶7} David Matuke, who was with Ms. Castano's group, chased after the victim as she ran after Ms. Benson's car and witnessed the impact. He is the only member of Ms. Castano's group who saw this part of the incident, and he ran after Ms. Benson's car as she drove away. Ms. Hart died from her injuries several days later.

{¶8} At trial, the defense and the state offered competing theories of these events as culminating with either a tragic accident or a knowing act. The defense posited that Ms. Benson had been unfamiliar with the one-way streets of downtown to explain why she twice happened upon Ms. Castano's group at Seventh and Walnut Streets, notwithstanding that this was several blocks in the opposite direction from where one would generally drive to return to either her or Ms. Slone's home from Plum Street. They suggested that Ms. Benson had hit Ms. Hart by mistake and in a panic, and that she had not been spurred by any particular intention to do so. In a police interview and in body-camera footage, Ms. Benson described her fear of another altercation with Ms. Castano's group to explain her flight from the scene. The state posited, instead, that ample contextual evidence demonstrating the tension

4

between the two groups and the earlier physical altercation between Ms. Hart and Ms. Benson confirmed a knowing act by the latter.

{¶9}   Ms. Benson was indicted on counts of murder (R.C. 2903.02(A)), murder (R.C. 2903.02(B)), felonious assault (R.C. 2903.11(A)(2)), aggravated vehicular homicide (R.C. 2903.06(A)(2)(a)), and failure to stop after an accident (R.C. 4549.02(A)(1)).  The jury found her guilty of all but the first count; and the trial court sentenced her to a total of 18 years to life in prison.   Ms. Benson appeals her convictions, presenting eight assignments of error, six of which relate to asserted flaws in her trial, and two of which concern alleged defects with her sentence.

II.

A.

{¶10}  We begin our analysis with Ms. Benson's third assignment of error, which challenges the admission of expert testimony by a police investigator.  We agree with Ms. Benson that the trial court abused its discretion in admitting certain aspects of the officer's testimony because (1) Crim.R. 16(K) dictates that an expert must produce an expert report in advance of trial, and the state failed to do so, and (2) certain opinions were "ultimate issue" testimony that improperly intruded on the jury's province.  Nevertheless, in light of the wealth of other, admissible evidence at trial, we find this error harmless, as more fully described below.

{¶11}  This issue arises in a slightly odd procedural posture because the putative expert, Cincinnati Police Officer Jon Halusek, was not tendered as an expert at trial, at least initially.  However, no one disputes that he offered expert testimony, so much so that the state concedes on appeal that he was an expert.

{¶12}  Because he was an expert witness, this triggered the applicability of Crim.R. 16(K), which we recently discussed in *State v. Hall*, 1st Dist. Hamilton Nos.

C-17069 and C-170700, 2019-Ohio-2985. As we recognized in *Hall*, Crim.R. 16(K) requires that an expert witness prepare a "written report summarizing the expert witness's testimony, findings, analysis, conclusions, or opinion, and shall include a summary of the expert's qualifications." That report must be turned over to the other side "no later than twenty-one days prior to trial," in the absence of good cause shown that does not prejudice the other side. *Id.* "The rule also contains a simple remedy for a violation: 'Failure to disclose the written report to opposing counsel shall preclude the expert's testimony at trial.' " *Hall* at ¶ 10, quoting Crim.R. 16(K).

{¶13} The purpose of the rule, of course, is to prevent sandbagging and trial by ambush with respect to experts. *Hall* at ¶ 11 (surveying case law). For similar reasons, a party cannot pretend its witness is not an expert, smuggle in expert testimony, and then belatedly acknowledge it was actually expert testimony. That would enable a party to circumvent the requirements of Crim.R. 16(K) with impunity.

{¶14} Perhaps best illustrating the need for expert reports, the *state* took the position at trial that a defense expert could not testify because he failed to tender an expert report pretrial, and the trial court agreed and excluded the testimony. Ms. Benson's counsel called Paul Jahn, a witness who specialized in compiling and analyzing video, and belatedly sought to qualify him as an expert in apparent response to Officer Halusek's testimony. As Ms. Benson's counsel began to elicit testimony relative to her mental state, the state objected on the basis that the "witness's expertise, if any, is in creating the videography, now he's interpreting." Ms. Benson's counsel responded that Mr. Jahn was also a crash reconstructionist and sought to qualify him as such. In response, the state protested, wrapping itself in Crim.R. 16(K): "It's against the rules of discovery and trial practice for that matter,

Your Honor." The trial court ultimately sustained the state's objection, but defense counsel failed to proffer the substance of Mr. Jahn's expert opinions. We therefore find ourselves in the unusual position of having two improperly designated experts with only the defense expert's testimony excluded.

{¶15} We hold that the admission of Officer Halusek's expert testimony violated the requirements of Crim.R. 16(K) and constituted an abuse of discretion, largely for the reasons we explained in *Hall*. *Hall*, 1st Dist. Hamilton Nos. C-170699 and C-170700, 2019-Ohio-2985, at ¶ 10-20 (emphasizing the lack of report and the "simple remedy contained within the rule"). The core expert testimony was also inadmissible for the independent reason that Officer Halusek expressed an improper opinion on the ultimate issue.

{¶16} To be sure, Evid.R. 704 allows for opinions as to the ultimate issue: "Testimony in the form of an opinion or inference otherwise admissible is not objectionable solely because it embraces an ultimate issue to be decided by the trier of fact." By the same token, such opinions are not automatically admissible, either: "[b]efore such evidence is admitted, there must be a determination that the evidence comports with the other applicable Rules of Evidence." *Schaffter v. Ward*, 17 Ohio St.3d 79, 81, 477 N.E.2d 1116 (1985).

{¶17} In other words, the ultimate-issue opinion must be otherwise proper lay or expert testimony. With respect to the latter, "expert testimony is admissible if it will assist the trier of fact in understanding the evidence in the case or in determining a fact in issue." *State v. Bidinost*, 71 Ohio St.3d 449, 454, 644 N.E.2d 318 (1994), citing *State v. Boston*, 46 Ohio St.3d 108, 118, 545 N.E.2d 1220 (1989). Such testimony must be "beyond the common knowledge of the jurors." *Id.*, citing *State v. Koss*, 49 Ohio St.3d 213, 216, 551 N.E.2d 970 (1990).

{¶18} An expert must be qualified "by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony[,]" and the testimony must be grounded in reliable methods. Evid.R. 702(B) and (C). "The admission of expert testimony is within a trial court's discretion." *State v. Williams*, 74 Ohio St.3d 569, 576, 660 N.E.2d 724 (1996), citing *State v. Williams*, 4 Ohio St.3d 53, 446 N.E.2d 444 (1983), syllabus. "An expert opinion is admissible when it 'dispels a misconception common among lay persons.' " *Id.*, quoting Evid.R. 702(A).

{¶19} The record reflects that Officer Halusek, a 29-year veteran of the traffic unit, had been a certified "reconstructionist" since 2011 and had often testified in that capacity (three jury trials in the prior year alone). Based on his expertise, the trial court, over objection,[1] allowed him to testify:

> I could tell that the front tires, the steer tires on the vehicle –
> after the victim came out and was beating on the hood, if you watch
> the vehicle, you'll see the front tires turn to the right. At that point in
> time the driver of the vehicle had basically five options.

> Her five options would have been to stay still, to go in reverse,
> to go forward, to go left and right. At that point in time, with the
> vehicle in the center of the street, she could have done four of the five
> without striking the individual.

> *By watching the video* I see the tires of the front of the car turn
> to the right and strike the individual. So, in that, you know, *it became
> clear to us that it was an intentional act when she turned to the right
> to strike her.*

---

[1] Defense counsel objected to the testimony and had requested to approach, which the trial court denied. At that point in time, the state had not identified the officer as an expert.

(Emphasis added.) Later in his testimony, after offering that opinion, Officer Halusek linked his expertise to the ultimate issue:

> I view things differently than normal people do. I'm looking for the mechanics of what occurred in the crash. * * * I'm looking for things such as brake lights of a vehicle. I'm looking for things as, did it accel, did it stop, did it go left, did it go right. * * * I'm not looking necessarily at what generally people see.

{¶20} The ultimate issue testimony represents the focal point of Ms. Benson's challenge on appeal. The Supreme Court of Ohio, in *Schaffter*, 17 Ohio St.3d 79, 477 N.E.2d 1116, held that expert opinion testimony on the ultimate issue of point-of-impact in a vehicle-collision case can be appropriate, if helpful, where the expert opinion does not carry the risk of being unfairly prejudicial, confusing the issues, or misleading the jury. *Id.* at 81. In *Schaffter*, where there were no independent eyewitnesses and the scene was "near a hillcrest on a narrow, unmarked, partially snow-covered rural road," a mechanical engineer was allowed to give his opinion as to where the collision had occurred. *Id.* *But see Trebotich v. Broglio*, 33 Ohio St.2d 57, 61, 294 N.E.2d 669 (1973) (where there were conflicting, independent eyewitness accounts, the probative value of an expert opinion was substantially outweighed by its tendency to unfairly prejudice the jurors against one of those eyewitnesses). The determination is fact-intensive—our own decisions on ultimate-issue testimony have gone both ways, depending on the circumstances. *Compare Lee v. Baldwin*, 35 Ohio App.3d 47, 49, 519 N.E.2d 662 (1st Dist.1987) (holding that vehicular collision expert's opinion as to causation of a vehicle collision "provided nothing in the way of assistance to the jury in its determination of the ultimate issue of causation"), and *Wheeler v. Hendershot*, 1st Dist. Hamilton No. C-

9

830891, 1984 WL 7091, *2 (Nov. 28, 1984) ("[W]hether [the traffic accident] * * * was caused by the plaintiff's inattention was within the experience, knowledge and comprehension of the jury.") *with Haley v. Mason and Dixon Lines, Inc.*, 1st Dist. Hamilton No. C-910221, 1992 WL 205798, *5 (Aug. 26, 1992) (holding that where there was only one, independent eyewitness, expert testimony "could have aided the jury in determining the cause of the accident."). These same principles apply to cases in which a jury has access to audio or visual evidence. *See, e.g., State v. Warmus*, 197 Ohio App.3d 383, 2011-Ohio-5827, 967 N.E.2d 1223, ¶ 30 (8th Dist.) (holding audio/visual technology expert opinion testimony was not appropriate as to a difficult-to-understand 911 call because "this became a factual issue for the jury to resolve" when "[the defendant] and the state fundamentally disagreed on what words were spoken"); *State v. Eddy*, 2017-Ohio-741, 86 N.E.3d 144, ¶ 54 (8th Dist.) ("[T]he jurors were capable of viewing the video themselves to determine exactly what it did or did not know regarding who shot first.").

{¶21} While certainly Officer Halusek's experience might enable him to appreciate details that others might miss, in this instance, we fail to see how his opinion on the intentionality of the act assisted the jury. The jury here was perfectly capable of watching the same video as Officer Halusek and drawing their own conclusion between the competing theories offered by the state and the defense. The ultimate issue here was not "beyond the common knowledge of the jurors" so as to warrant an expert opinion in light of the available video evidence. *State v. Koss*, 49 Ohio St.3d 213, 216, 551 N.E.2d 970 (1990). The trial court ultimately seemed to acknowledge as much: "The way the wheels are turned, or not, it's up to the jury to determine whether it's an accident." We agree with that assessment and conclude

that, under the facts presented here, the trial court should not have permitted the state's expert to opine on the ultimate issue and trespass on the jury's province.

{¶22} Having found error pursuant to Crim.R. 16(K) and Evid.R. 704 and 702, we now consider whether that error was harmless. "Crim.R. 52 affords appellate courts limited power to correct errors that occurred during the trial court proceeding." *State v. Perry*, 101 Ohio St.3d 118, 2004-Ohio-297, 802 N.E.2d 643, ¶ 9; *see also Hall*, 1st Dist. Hamilton Nos. C-170699 and C-170700, 2019-Ohio-2985, at ¶ 20. Because Ms. Benson's counsel objected here, we review for harmless error— " 'a standard significantly more favorable to the defendant.' " *Perry* at ¶ 15, quoting *United States v. Curbelo*, 343 F.3d 273, 286 (4th Cir.2003). Under the harmless-error standard, the state bears the burden of showing that "the error did not affect the substantial rights of the defendant." (Citation omitted.) *Id.*

{¶23} The Supreme Court, in *State v. Morris*, 141 Ohio St.3d 399, 2014-Ohio-5052, 24 N.E.3d 1153, characterized the harmless-error rule as a way "to forgive technical mistakes" and set out a three-part analysis to determine the effect (if any) of the error: (1) "[T]here must be prejudice to the defendant as a result of the admission of the improper evidence at trial"; (2) "an appellate court must declare a belief that the error was not harmless beyond a reasonable doubt," i.e., that there was "no reasonable possibility that the testimony contributed to the accused's conviction"; and (3) "in determining whether * * * the error is harmless beyond a reasonable doubt, the court must excise the improper evidence from the record and then look to the remaining evidence." *Id.* at ¶ 24, 27-29. As to the third prong, the court suggested that harmless-error cases involve " 'overwhelming evidence of guilt or some other indicia that the error did not contribute to the conviction.' " *Id.* at ¶ 29, quoting *State v. Rahman*, 23 Ohio St.3d 146, 151, 492 N.E.2d 401 (1986), quoting

11

*State v. Ferguson*, 5 Ohio St.3d 160, 166, 450 N.E.2d 265 (1983), fn. 5. The court emphasized that the proper focus of the inquiry is " 'not to sit as the supreme trier of fact, but rather to assess the impact of this erroneously admitted testimony upon the jury.' " *Id.*, quoting *Rahman* at 151, fn. 4. In other words, "an appellate court must consider both the impact of the offending evidence on the verdict and the strength of the remaining evidence after the tainted evidence is removed from the record." *Id.* at ¶ 33.

{¶24} Cases that grapple with this analysis often reach the first conclusion easily—finding prejudice apparent in erroneously admitted evidence. *See, e.g., State v. Clinton*, 153 Ohio St.3d 422, 2017-Ohio-9423, 108 N.E.3d 1 (a prior killing by the defendant); *State v. Ricks*, 136 Ohio St.3d 356, 2013-Ohio-3712, 995 N.E.2d 1181 (a hearsay identification of the defendant by his accomplice); *State v. Harris*, 142 Ohio St.3d 211, 2015-Ohio-166, 28 N.E.3d 1256 (a psychologist's opinion as to feigned mental illness). The analysis usually turns on the consideration of the strength of the remaining evidence. *Compare Morris* at ¶ 30 (in deeming the error prejudicial, the court noted that the remaining, properly admitted evidence "was not strong. There was no physical evidence, and there were questions regarding the credibility of * * * the main witness"), *Harris* at 221 (holding that error was not harmless where the remaining inculpatory evidence was only the contradictory testimony of other inmates), and *State v. Borden*, 1st Dist. Hamilton No. C-140245, 2015-Ohio-333, ¶ 10 (holding that error was not harmless where the remaining evidence included no physical evidence tying defendant to the crime) *with Clinton* at ¶ 26-27, 117 (holding error harmless in the face of DNA evidence, jailhouse calls, and evidence tying defendant to the crime scene); *State v. Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930, ¶ 124 (holdinging error harmless in light of abundant evidence of

defendant's feud with the victim, threats to kill her, and efforts to secure a gun and eyewitness testimony that defendant stood over the victim's body before fleeing and admitted to the killing).

{¶25} We find ourselves in the same position. We cannot say, beyond a reasonable doubt, that Officer Halusek's opinion did not impact the jury's verdict. Because he was a veteran officer with considerable experience in crash reconstruction, we think the jury would have afforded his opinion on the ultimate issue significant weight among the other evidence. But that is only part of the analysis. Under *Morris*, we must now turn to the record—with Officer Halusek's testimony excised—and consider whether the remaining evidence overwhelmingly points to guilt.

{¶26} Unique to this case, as compared to some of those noted above, is the presence of ample video evidence at the jury's disposal of both the incident resulting in the victim's death and the events directly preceding it. Those videos show an extended, physical fight between Ms. Wright's group and Ms. Castano's group, in which Ms. Benson participated and specifically engaged one-on-one with the victim, Ms. Hart. They show that Ms. Benson, after turning onto Walnut Street for the second time, stopped her car, giving Ms. Hart an opportunity to approach. After Ms. Hart initially retreated to the sidewalk, Ms. Benson had the opportunity to, but did not, drive away from the second altercation. Instead, she remained and thereby prolonged the confrontation. The video captures the point of impact from multiple angles and the movements of Ms. Benson's car before and after impact. Ms. Benson's vehicle turned into the victim, straightened out, and drove off down Walnut Street in one continuous motion, without stopping.

{¶27} The jury received a healthy dose of this video evidence, through multiple witnesses, all of whom shared their perspective. The video was slowed down, still frames were taken from it, and everyone discussed or debated its significance. While we do not diminish the significance of the impact of Officer Halusek's testimony, his ultimate-issue testimony that draws the defense's ire on appeal represents a rather isolated comment in a sea of testimony about the videos.

{¶28} In addition to these videos, testimonial evidence shores up the state's case. Zama Ndefru and David Matuke, both with Ms. Castano's group that night, testified that, as Ms. Benson's car approached Seventh and Walnut Streets for the second time, the occupants yelled out the window and badgered Ms. Castano's group, undercutting the theory that Ms. Benson only happened upon their group again, and that she did not purposely seek to re-engage in the confrontation. Ms. Slone, the passenger in Ms. Benson's car, testified that Ms. Benson had previously lived downtown, likewise undercutting the theory that the second encounter was accidental and due to navigating unfamiliar, one-way streets.

{¶29} Ms. Slone testified that she had told Ms. Benson, at least twice, to stop after the car hit the victim, but that Ms. Benson said that she did not want to go back to jail. Mr. Matuke, as well as another witness, Sam Singh, confirmed that Ms. Benson's vehicle had never stopped after hitting the victim. Mr. Matuke testified that Ms. Benson's vehicle had "kind of turned towards [the victim]. And, you know, she – it ran her over * * *." Mr. Singh testified, "So it hits her. And she fell down. And they run the car on top of her."

{¶30} The jury also viewed body-camera video and a police interview with Ms. Benson shortly after the incident. Those roughly contemporaneous statements reveal numerous inconsistencies with video and testimonial evidence relative to the

incident, which the jury could have found damaging to her credibility and the defense's theory of the case. In the interviews, Ms. Benson insisted that the victim had already been at her car when she made the turn (for the second time) from Seventh Street to Walnut Street, which the videos reveal as false. She told a detective that, after the impact, she had pulled slightly away and stopped her car, inconsistent with testimony and video evidence showing her drive away without stopping at all. During this alleged stop, she claimed that she had seen the victim get up, and that the victim's friends had gathered around her, in an attempt to connect her flight from the scene to her fear of retaliation by Ms. Castano's group. But the video and testimony flatly contradicted all of this. Mr. Ndefru testified that he had stopped Ms. Castano's group, other than the victim and Mr. Matuke, from going after Ms. Benson's car, specifically asking Ms. Castano's older sister to keep the women in their group where they were as Ms. Benson made the turn a second time. Ms. Slone also testified that only one person had been near the scene. Video evidence confirms that nothing remotely resembling a "chase" of Ms. Benson's car by anyone, let alone the group of women from the prior fight, took place. Finally, Ms. Benson also expressed fear because the victim had had something black in her hand (potentially a weapon) while banging on Ms. Benson's car. Testimonial, video, and photographic evidence dispels this assertion.

{¶31} We recently decided *Hall*, 1st Dist. Hamilton Nos. C-170699 and C-170700, 2019-Ohio-2985, where we likewise found a violation of Crim.R. 16(K) and, under the circumstances there, reversed the conviction, and remanded for a new trial. There, in a rape and gross-sexual-imposition case, the trial court admitted a detective's opinion testimony as "an 'expert in investigating child abuse and neglect' " without an expert report under Crim.R. 16(K). *Id.* at ¶ 9. The case involved

15

a credibility battle without independent corroborating evidence of the sexual assaults, and the expert's testimony effectively bolstered the credibility of the victims, thereby tipping the scales. *Id.* at ¶ 18-25. The expert there proved critical to the state's case, as demonstrated by the state's reliance on the detective's conclusions in closing argument and rebuttal, emphasizing her credibility with the jury. *Id.* at ¶ 19; *see also Morris*, 141 Ohio St.3d 399, 2014-Ohio-5052, 24 N.E.3d 1153, at ¶ 31-32 ("[T]he actions of a prosecutor may combine with an evidentiary error to cause greater impact. * * * [B]latant prejudice may override even a strong case and require a new trial.").

{¶32} We ultimately find the error here to be harmless, and the distinction we draw with *Hall* turns on the caliber of properly admitted evidence between the two cases. In *Hall*, the other evidence at hand was comparatively weak, resulting in acquittal on eight of the 12 counts. Here, by contrast, the inculpatory evidence is much more extensive and powerful, as detailed above.

{¶33} We have carefully reviewed the evidence in this case and think it most akin to *Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930, and to our prior decisions in *State v. Steelman*, 2018-Ohio-1732, 111 N.E.3d 923 (1st Dist.), and *State v. Kelley*, 1st Dist. Hamilton No. C-140112, 2014-Ohio-5565. In *Steelman*, we considered the improper admission of hearsay; in *Kelley*, we considered the improper admission of other acts evidence. We applied *Morris* in each and concluded that both erroneous admissions prevented us from holding that the errors were harmless beyond a reasonable doubt. Nevertheless, we held that the strength of the remaining evidence in each case demonstrated that the errors did not determine the convictions; therefore, the errors were harmless. In *Steelman*, we considered the fact that the defendant had been found "with the stolen goods within hours of the

burglary," had known pertinent information about the crime that would not likely be known by someone other than the guilty party, and had apologized to a member of the victim's family, and his DNA had been found near the scene of the burglary. *Steelman* at ¶ 40. This, we held, constituted "overwhelming independent evidence of [the defendant's] guilt." *Id.* at ¶ 43. Likewise, in *Kelley*, we relied on "overwhelming" other evidence of guilt: identifications by victims, witness testimony placing defendant at the scene prior to the incident, and evidence showing that the defendant fled the state. *Kelley* at ¶ 31.

{¶34} Even without Officer Halusek's improper opinion, the evidence against Ms. Benson was overwhelming, for the reasons we detailed above. We accordingly hold that it was harmless error to admit his opinion on Ms. Benson's intent.

B.

{¶35} Before moving to the remaining assignments of error relative to her trial, we address Ms. Benson's fourth assignment of error, as her argument here draws upon the assignment of error just resolved. In it, Ms. Benson charges the ineffective assistance of her counsel. To establish this, she must demonstrate (1) that her counsel's ineffectiveness was "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment[,]" and (2) that her counsel's errors were "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

{¶36} Ms. Benson first cites her counsel's statement during jury selection that she would take the stand, which she did not ultimately do, and frames this as a "broken promise" that damaged her standing before the jury. She cites only one case in support of this argument: *State v. Ikharo*, 10th Dist. Franklin No. 02AP-632,

17

2003-Ohio-2319. In that case, the court agreed that "broken promises" in an opening statement justified an ineffective assistance claim, but only in conjunction with the disclosure of the defendant's prior convictions. *Id.* at ¶ 20. Even to the extent that we were to find a "broken promises" argument, standing alone, sufficient to support an ineffective assistance claim, we do not believe that the record bears out a broken promise here. To the contrary, in closing, Ms. Benson's counsel tells the jury, "Now, in the beginning of the case I told you that Briana was going to testify. She did. For over an hour and 15 minutes." (Counsel was referring to a custodial interview and body-camera footage with Ms. Benson that the jury viewed.) Maybe that was defense counsel's plan all along—but if not, counsel did a nice job covering this issue at closing and avoiding any prejudice for the defendant. *See State v. Savage*, 2018-Ohio-5125, 124 N.E.3d 414, ¶ 23-27 (7th Dist.) (rejecting a similar argument because a defendant always has the right to change her mind and not testify, the statement about the defendant's anticipated testimony was not "the crux of the opening statement," and the jury was instructed not to consider failure to testify for any reason). Additionally, the court instructed the jury, "She has a constitutional right not to testify. The fact that the defendant did not testify must not be considered for any purpose." In light of counsel's finessing this point in closing and the court's delivery of appropriate instructions regarding her Fifth Amendment rights, Ms. Benson cannot demonstrate the requisite prejudice here to meet the second *Strickland* prong.

{¶37} Her more substantive ineffective-assistance argument concerns counsel's failure to qualify Paul Jahn as an expert. As discussed above, the state did not provide the required expert report for Officer Halusek (or even acknowledge qualifying him as an expert at the time). On the one hand, it seems to us unfair

under those circumstances to suggest that her trial counsel should have nevertheless anticipated expert testimony on this subject to rebut. On the other hand, we would normally expect counsel to proffer in the face of a trial court's foreclosing the chance to introduce expert testimony. Here, Ms. Benson's trial counsel's failure to proffer the expert testimony that Mr. Jahn would have provided limits our ability to review this issue. *See State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, ¶ 113 (holding that the exclusion of evidence rises to the level of error if (1) a substantial right of the party is affected, and (2) "the substance of the excluded evidence was made known to the court"). The record before us is insufficient as to the would-be expert testimony such that we cannot find Ms. Benson's trial counsel deficient on that basis. Certainly, Ms. Benson's counsel should have proffered what the expert intended to opine, but perhaps Mr. Jahn had nothing meaningful to say. We overrule Ms. Benson's fourth assignment of error based on the present state of the record.

C.

{¶38} In her first and second assignments of error, Ms. Benson challenges the weight and sufficiency of the evidence resulting in her convictions. As to the former, the "[w]eight of the evidence concerns 'the inclination of the *greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other.' " (Emphasis sic.) *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *Black's Law Dictionary* 1594 (6th Ed.1990). It concerns the effect of the evidence on the reviewing court—leaving the distinct impression that the jury clearly lost its way. *Id.* On the latter, " '[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable

doubt.' " *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 42, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶39} While Ms. Benson certainly challenges both on appeal, her argument focuses on sufficiency. In this respect, she zeros in on the claim that the state failed to provide evidence of her intent for purposes of the felonious assault and murder charges. But intent is rarely shown by direct evidence—"[w]hether a defendant acts knowingly, absent his admission, can only be determined from all the surrounding facts and circumstances." (Citation omitted.) *State v. Gerth*, 1st Dist. Hamilton No. C-120392, 2013-Ohio-1751, ¶ 10. In *Gerth*, voluminous evidence showed a high-speed chase, speeding, and traffic violations ending in a crash with a taxi cab, which we considered sufficient to demonstrate that the defendant had acted knowingly. Likewise, in *State v. Thacker*, 4th Dist. Lawrence No. 04CA12, 2005-Ohio-1057, ¶ 2, dealing with an aggravated menacing conviction that included a knowingly mens rea, the court held that "the state presented evidence that the incident [arose] out of a heated exchange and that Thacker was angry and aggressive. This evidence is sufficient to allow an inference of intent." *See also State v. Kessler*, 8th Dist. Cuyahoga No. 93340, 2010-Ohio-2094, ¶ 18 (sustaining a knowingly mens rea conviction based on "direct evidence that [the defendant] followed Gurewicz up the street in her vehicle as he fled from his assailants, and [the defendant] knowingly pulled into the driveway Gurewicz was crossing while attempting to escape, nearly pinning him between her car and a parked car").

{¶40} Having reviewed all of the video, photos, and testimonial evidence, we conclude that the jury had before it sufficient evidence upon which they could reasonably base their verdict, including a finding that Ms. Benson had acted

knowingly. We have surveyed this evidence already above, but briefly, the record contains evidence, via social media and testimony, of extraordinary tension between Ms. Benson's sister, whom Ms. Benson claimed to be protecting that evening, and Ms. Castano. That tension erupted into outright violence not just between Ms. Benson's sister and Ms. Castano, but between Ms. Benson and Ms. Hart. With the brutality of the fight between the latter two as a backdrop, the jury reasonably could have determined, based on the video evidence, that Ms. Benson knowingly struck Ms. Hart with the car. We accordingly hold that sufficient evidence underpinned the jury's verdict.

{¶41} Moreover, we see no merit in Ms. Benson's challenge to the weight of the evidence. The circumstantial evidence weighs heavily toward the conclusion reached by the jury, for reasons we have already described above. We therefore overrule assignments of error one and two.

## D.

{¶42} In her fifth assignment of error, Ms. Benson argues the trial court erred in admitting "bad acts" evidence, namely, her toxicology report and Ms. Castano's social media communications and restraining order as to Ms. Wright (Ms. Benson's sister). She argues that, as to the toxicology report, it had no relevance to the indicted charges. Even if this were error, we would deem it harmless. Ms. Benson admitted taking a shot of alcohol and smoking marijuana on the night of the incident in her police interview, which the jury viewed. In that video, Ms. Benson does not come across as impaired. Similarly, videos showing the fight preceding the incident do not reflect any apparent intoxication on her part. In light of her admissions, this evidence, even if improper, was simply cumulative. *See State v. Stone*, 1st Dist. Hamilton No. C-140028, 2014-Ohio-4444, ¶ 40 (declining to reach

the issue of whether an officer's expert opinion was admissible where the opinion was cumulative of other evidence, including the defendant's admission).

{¶43} Ms. Benson does not cite case authority to support exclusion of the social media evidence. Her trial counsel did not object to its admission, rendering it subject to plain-error review. Under Crim.R. 52(B), "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002) ("[Defendant] failed to object * * * at trial and thereby forfeited all but plain error."). To demonstrate plain error, a defendant must show that (1) there was an error, i.e., the court broke a legal rule, (2) the error was plain, i.e., obvious in the course of the proceedings, and (3) the error affected substantial rights, i.e., it clearly determined the trial's outcome. *Id.* at 27. *See also State v. Sanders*, 92 Ohio St.3d 245, 263, 750 N.E.2d 90 (2001) ("Plain error exists only when it is clear that the verdict would have been otherwise but for the error."); *State v. Long*, 53 Ohio St.2d 91, 97, 372 N.E.2d 804 (1978) ("Notice of plain error under Crim.R. 52(B) is to be taken with the upmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice."); *State v. Webster*, 1st Dist. Hamilton No. C-120452, 2013-Ohio-4142, ¶ 41 (quoting *Long*).

{¶44} The state cites *State v. Johnson*, 1st Dist. Hamilton No. C-170371, 2018-Ohio-4131, for the proposition that evidence, even other-acts evidence, may be admitted "to give a complete picture of what occurred." (Citations omitted.) *Id.* at ¶ 30. *See also State v. Scott*, 1st Dist. Hamilton No. C-960557, 1997 WL 346151, *1 (June 25, 1997), citing *State v. Wilkinson*, 64 Ohio St.2d 308, 317, 415 N.E.2d 261 (1980), citing to *United States v. Roberts*, 548 F.2d 665, 667 (6th Cir.1977) ("Background information is admissible to give the jury the setting of the case").

Needless to say, there are limits to that principle, but the social media evidence here served such an appropriate purpose by demonstrating the high level of animosity between Ms. Benson's sister (Ms. Wright) and Ms. Castano. In it, Ms. Wright refers on multiple occasions to "pulling up on" and "dragging" Ms. Castano. Ms. Castano explained during her testimony that these terms mean pulling up in a car to fight and dragging someone by her hair. This evidence, from the weeks leading up to the fight on the night of Ms. Hart's death, gives context to whether the initial encounter between the groups was a deliberate attempt to see these virtual threats through. Ms. Benson took exactly these actions during the night in question by literally dragging Ms. Hart by the hair during the initial encounter. Even if we were to find that the evidence failed an Evid.R. 403 analysis, we hold that the error would have been neither obvious nor determinative of the trial's outcome for purposes of plain-error review. We accordingly overrule the fifth assignment of error.

E.

{¶45} Ms. Benson's sixth assignment of error, related to prosecutorial misconduct, is also subject to plain error review as it was not raised below. She argues that the state mischaracterized the evidence about her striking the victim with her car and/or referred to evidence outside of the record. Specifically, she charges that the following was inappropriate to remark in opening: "And the evidence will show you that what Briana Benson does then is stop. There's not motion. She backs up slightly, turns the wheel directly into Madie and drives forward over Madie." Also in opening, the assistant prosecuting attorney said, "[w]hen she finishes this deep drastic turn into Madie * * *. It's a distinct, it's a deliberate turn into a human being." In closing, the prosecutor made several references to Ms. Benson turning her wheels into Ms. Hart, once stating that this was done "knowingly." Ms. Benson

charges that all of this deprived her of a fair trial. We read these statements by the assistant prosecuting attorney, however, as her commenting on the state's interpretation of the evidence, conduct that could be equally charged against the defense. The defense painted Ms. Benson as gripped with "confusion, fear, and panic[,]" a picture not necessarily reflected by our review of the record. The error here, if any, does not amount to plain error.

{¶46} Ms. Benson also charges that the contrast drawn by the state between her court appearance and her actions constituted misconduct. In closing, the state argued:

> I think what's been presented to you here was the creation of an image.
> And the image that you were given is someone saying they were
> panicked. Someone seated here with their hair up in a bun and a little
> sweater on, that's an image, ladies and gentlemen. But that is not the
> person Madie Hart met on March 26th of 2017.

We are inclined to agree that this characterization was inappropriate, but such an isolated remark does not rise to the level of plain error when considering the overall context and evidence of this case.

{¶47} Finally under this assignment of error, Ms. Benson argues that it was improper for the state to reference the fact that potential sentences would not necessarily be "stacked." She does not cite authority for this charge, but maintains that the comment misled the jury, demeaning the seriousness of a multiple-count verdict. We are not persuaded that this constitutes plain error. Following the assistant prosecuting attorney's comments, the jury was instructed:

> Now, multiple counts. The charges set forth in each count of the
> indictment constitute a separate and distinct matter. You must

consider each count of the indictment and the evidence applicable to each separately, and you must state your finding as to each count *uninfluenced by your verdict as to the other counts.*

(Emphasis added.) "The jury is presumed to follow the instructions, including curative instructions, given to it by the trial court judge." *State v. Barrow*, 2018-Ohio-1703, 111 N.E.3d 714, ¶ 14 (1st Dist.), citing *State v. Loza*, 71 Ohio St.3d 61, 75, 641 N.E.2d 1082 (1994).

{¶48} None of the asserted instances of prosecutorial misconduct, even if substantiated, rises to the level of plain error that "clearly determined" Ms. Benson's convictions. *See Barnes*, 94 Ohio St.3d at 27, 759 N.E.2d 1240. We overrule her sixth assignment of error.

## F.

{¶49} Ms. Benson's last two assignments of error challenge technical aspects of her sentence. In her seventh assignment of error, she contends that she should not have received a criminal sanction (a lifetime driver's license suspension) related to the aggravated-vehicular-homicide count. The state concedes that, because the aggravated-vehicular-homicide count merged with the murder count as allied offenses, the lifetime driver's license suspension on the former count was inappropriate. *See State v. Williams*, 148 Ohio St.3d 403, 2016-Ohio-7658, 71 N.E.3d 234, ¶ 29 ("[W]hen the trial court concludes that the accused has in fact been found guilty of allied offenses of similar import, imposing separate sentences for those offenses is contrary to law and the sentences are void on the face of the judgment of conviction."). We agree and accordingly sustain Ms. Benson's seventh assignment of error. As explained in *Williams*, where the sentencing court had no discretion to impose the sentence that it did, courts of appeals are constitutionally

authorized to modify judgments of inferior courts. *Id.* at ¶ 31; Ohio Constitution, Article IV, Section 3(B)(2). We therefore sustain the seventh assignment of error and modify the judgment of the trial court to vacate the lifetime driver's license suspension imposed for Count 4 (aggravated vehicular homicide, R.C. 2903.06(A)(2)(a)), which merged with Count 2 (murder, R.C. 2903.02(B)). The remaining sentences are not affected by this ruling.

{¶50} Ms. Benson's final assignment of error charges that consecutive sentences were contrary to law and not supported by the record. The trial court stated, "[n]ow, as you know, ma'am, you are under indictment in Case No. B171693-A. And you're awaiting sentence and/or trial on that particular charge. And it's my belief that it's necessary to adequately protect the public and punish you; it's not disproportionate to any sentence that the court has ever imposed." That is sufficient for purposes of R.C. 2929.14(C)(4)(a). "[A] trial court is not required by Crim.R. 32(A)(4) to give reasons supporting its decision to impose consecutive sentences." *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, ¶ 27. The finding for purposes of R.C. 2929.14(C)(4) is incorporated into the sentencing entry, and we conclude that those findings are supported by the evidence in the record. Ms. Benson's eighth assignment of error is overruled.

### III.

{¶51} Ms. Benson did not receive a perfect trial. But the Constitution does not guarantee perfection, and the fallibility of adjudication by human beings often renders perfection elusive. Nevertheless, after having reviewed the evidence, authorities, and arguments extensively, we are confident that she received a fair trial. We accordingly overrule assignments of error one, two, three, four, five, six and eight

and affirm her convictions. We sustain assignment of error seven and modify the sentence as described above.

Judgment affirmed as modified.

CROUSE, J., concurs.
MOCK, P. J., concurs separately.

**Mock, P.J.,** concurring separately.

{¶52} I agree with the majority's affirmance of the judgment of conviction, as modified. But I write separately to note that because Benson failed to object timely and with specificity to Officer Halusek's expert testimony, as required by Evid.R. 103, and to the absence of a written expert report, as required by Crim.R. 16(K), we must review the third assignment of error only for plain error.

{¶53} It is well established that discovery violations can be subject to forfeiture if not raised in the first instance in the trial court. *See State v. Penland*, 132 Ohio App.3d 176, 187, 724 N.E.2d 841 (1st Dist.1998); *see also State v. Mieczkowsk*, 2018-Ohio-2775, 115 N.E.3d 758, ¶ 60 (7th Dist.); *State v. Smith*, 2017-Ohio-359, 83 N.E.3d 302, ¶ 24 (9th Dist.). And our sister districts have acknowledged that both waiver—the intentional relinquishment of a known right— and forfeiture—the failure to preserve an objection—apply to post-2010 violations of Crim.R. 16(K). *See State v. Walls*, 2018-Ohio-329, 104 N.E.3d 280, ¶ 34 (6th Dist.) (a party may waive a violation of Crim.R. 16(K)); *see also State v. Luce*, 6th Dist. Lucas No. CR0201501474, 2017-Ohio-4472, ¶ 44 (applying plain-error analysis when defendant did not object at trial to the state's failure to provide an expert report under Crim.R. 16(K)); *State v. Palmer*, 12th Dist. Butler No. CA2013-12-243, 2014-Ohio-5491, ¶ 33. *Compare Hall*, 1st Dist. Hamilton Nos. C-170699 and C-170700, at ¶ 9 (noting that the defendant "duly objected" to the testimony of the state's expert when the state had failed to furnish a Crim.R. 16(K) report).

27

{¶54} As the majority correctly notes, the gravamen of Benson's third assignment of error was a challenge to Officer Halusek's ultimate-issue testimony.[2] The larger portion of Officer Halusek's testimony, memorialized on 62 pages of transcript, was devoted to his observations and description of the crime scene and to the police investigation. Approximately two thirds of the way through his testimony, in four paragraphs, Officer Halusek offered his opinion that those facts and the Uber video indicated that Benson had acted intentionally. The majority quotes Officer Halusek at length.

{¶55} But in response to those statements, Benson remained mute. She failed to object to Officer Halusek's ultimate-issue testimony, and to the absence of a written expert report "summarizing the expert witness's testimony, findings, analysis, conclusions, or opinion," as required by Crim.R. 16(K). A timely and specific objection to the admission of the ultimate-issue testimony could have drawn the trial court's attention to the alleged error at a time when it could have been corrected or avoided. *See* Evid.R. 103(A)(1). And a timely objection under Crim.R. 16(K) would have afforded the court the opportunity to exclude Officer Halusek's expert testimony, as it did when the state timely raised the same issue with regard to Benson's expert, Paul Jahn. *See Hall* at ¶ 10.[3]

{¶56} Benson's failure to object to Officer Halusek's expert testimony on either basis limits us to a review only for plain error. *See* Evid.R. 103(D); *see also Luce*, 6th Dist. Lucas No. CR0201501474, 2017-Ohio-4472, at ¶ 44. An error rises to the level of plain error only where it is obvious, outcome-determinative, and is so

---

[2] Benson identifies the absence of a written expert report as a basis for reversal in a single sentence of her appellate brief.

[3] We note that there is no requirement in Crim.R. 16(K) or in the case law of our Supreme Court that would require the trial court to anticipate a witness's testimony and to intervene sua sponte to prevent expert testimony in the absence of a written report.

extreme that it must be corrected to prevent a manifest miscarriage of justice. *See* Crim.R. 52(B); *see also State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 22-23.

{¶57} In light of the majority opinion's well-supported conclusion that evidence of guilt was "extensive and powerful" even without Officer Halusek's ultimate-issue testimony, I cannot find that the admission of that testimony affected the outcome of the trial, or caused a miscarriage of justice. *See Rogers* at ¶ 23. I would overrule the third assignment of error on that basis.

Please note:
The court has recorded its own entry this date.